NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| JOYCE ANN BODNAR, | Hon. Stanley R. Chesler |
|---|---|
| Plaintiff, | Civ. No. 04-3451 |
| v. | OPINION |
| IMAGISTICS INTERNATIONAL, INC., | |
| Defendant. | |

**CHESLER, District Judge**

THIS MATTER comes before the court on Defendant's, Imagistics International, Inc. ("Imagistics"), Motion for Summary Judgment (docket item # 13). For the reasons set forth below, the Court will GRANT in part and DENY in part Defendant's motion.

## I. BACKGROUND

Plaintiff, Joyce Ann Bodnar, ("Bodnar" or "Plaintiff") began working for Defendant, Imagistics International ("Imagistics") on October 7, 2003. (Compl. ¶ 11.) During the course of her employment, Shawn Leonard ("Leonard") was the Branch Manager of the Princeton office. (Def. Stat. Mat. Facts ¶ 3.) Leonard issued Plaintiff a counseling memorandum citing her for excessive absences and chronic tardiness. (Id. ¶ 4.) Leonard and Plaintiff met on December 11, 2003 to discuss the counseling memorandum. During the course of the meeting with Leonard, Plaintiff attempted to explain her absences and tardiness as a product of a previously undisclosed medical condition, and offered to produce doctors notes to justify further attendance

transgressions.  (Bodnar Dep. at 99.)

Soon thereafter, Plaintiff spoke with Sharon Murray, one of Imagistics' Human Resources Consultants, about her medical condition and its relation to her tardiness.  (Bodnar Dep. at 104.)  In addition, Plaintiff informed Ms. Murray of an incident involving Leonard which occurred earlier in Plaintiff's tenure.  Plaintiff told Ms. Murray of a conversation she had with Leonard in which she admitted feeling overwhelmed.  Plaintiff alleges that Mr. Leonard responded by stating, "You'll do fine.  You're attractive.  Attractive women in the industry do really fine."  (Bodnar Dep. at 92-93; Murray Aff. ¶ 5.)  Plaintiff disagreed with Leonard and stated that she believed attractive women have to work even harder.  Leonard responded, "Well, you're right.  A gatekeeper will see you walk in their office and take a piss to mark their spot."  (Bodnar Dep. 92-94.)

The incident that triggered Plaintiff's complaint to Human Resources occurred during a sales meeting on February 17, 2004.  Leonard was apparently discussing sales tactics that were inherently unethical.  (Leonard Dep. at 58.)  Leonard asked the employees whether they had "screwed" any of their customers.  (Bodnar Dep. at 109.)  Plaintiff was caught off guard by the question and needed it be repeated.  (Id.)   Immediately after the meeting, Plaintiff called Dawn Stevens, Imagistics' Director of Human Resources to inform her of the inappropriate comments made by Leonard at the sales meeting.  (Bodnar Dep. at 111-13.)  Ms. Stevens instructed Plaintiff to leave the office for the day.  (Bodnar Dep. at 171.)  Ms. Stevens directed Janet Clemons, a Human Resources Consultant, to investigate Plaintiff's allegations.  (Murry Aff. ¶ 6.)  During the investigation, Plaintiff described the following incidents to Ms. Clemons:

1.	On December 12, 2003, the day after Plaintiff's meeting with Leonard regarding her

2

        attendance, Leonard told her, "[y]ou look very nice today, young lady." (Pl. Stat. Mat. Facts ¶ 24(a).)

2. On another occasion, Mr. Leonard told Plaintiff, "You look very beautiful today. You'd make a lot more sales if you dressed like that more often." (Bodnar Dep. at 115.)

3. Commenting on Plaintiff's boots, Leonard inquired to Plaintiff, "What are you pulling today, Nancy Sinatra?"

4. The "gatekeeper" comment made by Mr. Leonard mentioned above.

5. At the company Christmas Party, during a meeting with Mr Leonard, he suggested to Plaintiff that she should be "trying out for Joe Millionaire," not working for Imagistics. (Bodnar Dep. at 141.)

6. Also at the Christmas Party, Leonard made Plaintiff stand next to Mike, a co-worker and said, "If I was a client, who do you think I would buy from?" Plaintiff responded, "Well, Mike, because he knows more than m." Leonard replied, "Wrong. I'd buy from you because you're a woman." (Bodnar Dep. at 116-17.)

7. Several occasions of George Ondic ("Ondic") staring at Plaintiff's breasts, including one time when his staring prompted her to put on her jacket. (Bodnar Dep. at 149-50.)

8. Plaintiff overheard Mr. Ondic respond "36-24-36" to another salesperson's telephone inquiry regarding the dimensions of a copy machine. Additionally, Mar. Ondic opined that "its's a man's world." (Bodnar Dep. 114, 86.)

9. At a staff holiday lunch Plaintiff commented about the number of "adult references" in the film "Willy Wonka and the Chocolate Factory." Leonard interjected stating that "she finally gets it as soon as she puts the bong away." (Bodnar Dep. at 149.)

10. At the same lunch, Leonard was boasting about a boat he purchased and offered to take Plaintiff water skiing. (Bodnar Dep. at 118-19, 121, 136.)

Plaintiff also told Ms. Clemens that she was provided with limited training and support. (Bodnar Dep. at 87; Def. Stat. Mat. Facts ¶ 17.)

        After interviewing Plaintiff, Ms. Clemons informed her she did not need to return to the Princeton office but instead could work from home while her complaint was under investigation. (Bodnar Dep. at 88; Def. Stat. Mat. Facts ¶ 21.) Accordingly, February 17, 2004 was Plaintiff's

last day in the Princeton office.

At the conclusion of the investigation, Human Resources issued management letters to both Mr. Ondic and Mr. Leonard containing explicit reminders that sexual harassment is not tolerated by Imagistics and could result in termination. (Murry Aff. ¶ 8, Ex. B.) Mr. Leonard was sent a letter from Human Resources which also recommended that he be placed on a Performance Improvement Plan and attend sensitivity training. (Murry Aff. ¶ 8, Ex. B.)

Human Resources contacted Plaintiff and informed her that she could return to work at the Princeton office or, alternatively, transfer to the Philadelphia or Connecticut offices. (Bodnar Dep. at 166.) Plaintiff rejected each option and in March or April 2004 went out on an extended disability leave. (Id. at 182.) Plaintiff's leave ended on August 15, 2004 at which time she did not return to Imagistics. (Id. at 183.) Plaintiff started at a new job on August 16, 2004. (Id. at 42-43.)

## II. DISCUSSION

### 1. Standard of Review

Federal Rule of Civil Procedure 56(c) provides that summary judgment should be granted "if pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, (1986); Kreschollek v. Southern Stevedoring Co., 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. See Boyle v. Allegheny Pennsylvania, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden

of establishing that no genuine issue of material fact remains.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

The Supreme Court has stated that in evaluating a defendant's motion for summary judgment:

> [t]he judge must ask . . . not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented.  The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.   The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of evidence that the plaintiff is entitled to a verdict . . . .

Anderson, 477 U.S. at 252.  A fact is "material" only if it will affect the outcome of a lawsuit under the applicable law, and a dispute over a material fact is "genuine" if the evidence is such that a reasonable fact finder could return a verdict for the nonmoving party.  See id.

Once the moving party has properly supported its showing of no triable issue of fact and of an entitlement to judgment as a matter of law, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts."  Matsushita, 475 U.S. at 586; see also Anderson, 477 U.S. at 247-48.  The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  Celotex, 477 U.S. at 324; Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992) ("to raise a genuine issue of material fact . . . the [non-moving party] need not match, item for item, each piece of evidence proffered by the movant," but rather "must exceed the 'mere scintilla' threshold"), cert. denied, 507 U.S. 912 (1993).

**2.      Defendant's Motion for Summary Judgment**

A.      LAD Claims

In Count One of the Complaint, Plaintiff has raised claims under New Jersey Law Against Discrimination ("LAD"), claiming a hostile work environment due to sexual harassment, constructive discharge and retaliation.   (Compl. ¶¶ 9-57.)

   **1.      Hostile Work Environment / Constructive Discharge**

As the complainant, Plaintiff bears the burden of establishing a prima facie case of sexual harassment.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  To establish a prima facie case under LAD for a hostile work environment, Plaintiff must show that the alleged conduct "(1) would not have occurred *but for* the employee's gender; and it was (2) *severe or pervasive enough* to make a (3) *reasonable woman* believe that (4) the conditions of employment are altered and the *working environment is hostile or abusive*."  Smith v. Exxon Mobile Corp., 374 F. Supp. 2d 406, 418 (D.N.J. 2005)(emphasis in original) (quoting Lehmann v. Toys "R" Us, Inc., 132 N.J. 587, 603-04 (1993).   "A hostile-environment constructive discharge claim entails something more: A plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign."  Pennsylvania State Police v. Suders, 542 U.S. 129, 147 (2004).

In determining whether a plaintiff has adduced evidence sufficient to establish an objectively hostile work environment, the court must examine the totality of the circumstances.  See Hargrave v. County of Atlantic, 262 F. Supp. 2d 393, 413 (D.N.J. 2003).  Consistent with the standard of review on a motion for summary judgment, "the Court must evaluate the evidence relating to these factors while drawing all reasonable inferences in favor of the Plaintiff."  Id.

In moving for summary judgment with respect to Plaintiff's hostile work environment claims, Defendants contend that there is insufficient evidence in the record from which a jury could conclude that the conduct about which Plaintiff complains constituted harassment or discrimination because of her gender. Defendants further argue that the conduct alleged, even if directed at Plaintiff because of her gender, was not sufficiently "severe or pervasive" to alter the terms and conditions of Plaintiff's employment and create an objectively hostile work environment actionable under NJ LAD. This Court disagrees.

A genuine dispute of material fact exists as to whether the treatment suffered by Plaintiff was severe and pervasive enough to make a reasonable woman believe that the conditions of employment are hostile or abusive. The record in this case, when viewed in the light most favorable to the Plaintiff, contains evidence of gender-based harassment which could be said to go beyond "simple teasing, offhand comments, and [non-serious] isolated incidents," which the Supreme Court has cautioned would not amount to discriminatory changes in employment. Faragher, 524 U.S. at 775. The record contains evidence of several incidents where Plaintiff was subjected to offensive comments based upon her gender:

- In a conversation with Leonard, Plaintiff admitted feeling overwhelmed. Mr. Leonard responded by stating, "You'll do fine. You're attractive. Attractive women in the industry do really fine." (Bodnar Dep. at 92-93; Murray Aff. ¶ 5.) Plaintiff disagreed with Leonard and stated that she believed that attractive women have to work even harder. Leonard responded, "Well, you're right. A gatekeeper will see you walk in their office and take a piss to mark their spot." (Bodnar Dep. 92-94.)

- Several occasions of Mr. Ondic staring at Plaintiff's breasts, including one time when his staring prompted her to put on her jacket. (Bodnar Dep. at 149-50.)

- Commenting on Plaintiff's boots, Leonard inquired to Plaintiff, "What are you pulling today, Nancy Sinatra?"

7

- Plaintiff overheard Mr. Ondic respond "36-24-36" to another salesperson's telephone inquiry regarding the dimensions of a copy machine. Additionally, Mar. Ondic opined that "its's a man's world." (Bodnar Dep. 114, 86.)

- On another occasion, Mr. Leonard told Plaintiff, "You look very beautiful today. You'd make a lot more sales if you dressed like that more often." (Bodnar Dep. at 115.)

- At the company Christmas Party, during a meeting with Mr Leonard, he suggested to Plaintiff that she should be "trying out for Joe Millionaire," not working for Imagistics. (Bodnar Dep. at 141.)

Furthermore, a jury could reasonably conclude that the impact and severity of Leonard's comments were aggravated by the fact that he was a member of the management, with direct responsibility for supervising Plaintiff's work performance. See Taylor v. Metzger, 152 N.J. 490, 503 (1997) (noting that the severity of the alleged harasser's racist remark was aggravated by the fact that it was made by a supervisor). Accordingly, the Court is satisfied that the evidence regarding allegedly harassing conduct towards Plaintiff raises a genuine issue of material fact with respect to whether Plaintiff was subjected to an objectively hostile work environment.

**2.     Retaliation**

To succeed on a claim for illegal retaliation, a plaintiff must show (1) that he/she engaged in protected activity; (2) adverse employment action by the employer either after or contemporaneous with the protected activity; and (3) a causal connection between the protected activity and the adverse action. Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 187 (3d Cir. 2003). Defendant's argue that Plaintiff suffered no adverse employment action after she filed her harassment complaint. (Def. Br. 20-22.)

An adverse employment action must result in serious tangible harm which alters an

employee's compensation, terms, conditions, or privileges of employment. See Burlington Industries, Inc. V. Ellerth, 524 U.S. 742 (1998). A plaintiff who, like here, voluntarily resigns may assert a claim of constructive discharge when the employer's allegedly discriminatory conduct creates an atmosphere that is the constructive equivalent of a discharge. Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001). The resignation is treated as if it were an outright dismissal by the employer, rendering the resignation an "adverse employment action" which can serve as the basis for a retaliation claim. See Duffy v. Paper Magic Group, Inc., 265 F.3d 163, 167-68 (3d Cir. 2001).

Again, the evidence in the record before this Court creates a genuine issue of material fact as to whether the allegedly harassing conduct made Plaintiff's working conditions so unpleasant or intolerable that a reasonable person in the employee's shoes would resign. A fact finder may conclude that Leonard and Ondic did, in fact, make the comments alleged by Plaintiff, and in such a way that made continued employment intolerable. On the other hand, a fact finder may disbelieve plaintiff's contentions about the comments made by Leonard and Ondic and the lack of assistance she allegedly received from her supervisors. Thus, Defendant's motion for summary judgment on Plaintiff's retaliation claim will be denied.

### 3. Defendant's *Faragher-Ellerth* Defense

In its motion for summary judgment, Imagistics also argues that the existence of a well-publicized policy prohibiting sexual harassment provides them with an affirmative defense to vicarious liability for the actions of Leonard and Ondic. (Def. Br. 17.) To support this proposition, Defendant relies on the United States Supreme Court's 1998 decisions in Ellerth, 524 U.S. 742 and Faragher v. City of Boca Raton, 524 U.S. 775 (1998). The Court held that

where no tangible employment action is taken, "a defending employer may raise an affirmative defense to liability or damages subject to proof by a preponderance of the evidence." Ellerth, 524 U.S. at 765; Faragher, 524 U.S. at 807.  This affirmative defense, the Court held, "comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Id.

     In support of its affirmative defense, Defendant states that Imagistics had a "well-publicized policy prohibiting sexual harassment, including a complaint process, of which plaintiff was fully aware." (Def. Br. 17.)  Plaintiff did, however, register two complaints with Imagistics' Human Resources department prompting an investigation.  Defendant argues that Plaintiff delayed in filing her harassment complaint and therefore did not "promptly report" the offensive conduct.  However, the response to Plaintiff's complaint and Defendant's efforts to promptly correct the sexually harassing behavior create a genuine issue of material fact in dispute.

     Defendant contends that they conducted a "probing inquiry" into Plaintiff's allegations and "imposed discipline on the accused harassers." (Def. Br. 18.)   Defendants cite to a letter sent by Sharon Murray in Human Resources to Mr. Leonard notifying him that he will be placed on a performance improvement plan ("PIP") and be required to attend seminars to improve his "professional image and behavior." (Murry Aff., Ex. B.)  The fact of whether alleged discipline was ever implemented is placed in dispute by the deposition testimony of Mr. Leonard, which provides in relevant part:

10

> Q: Were you ever placed on the performance improvement plan as referenced in [the letter]?
> A: I don't recall.
> Q: Were you ever required to attend any seminar to improve your professional image and behavior?
> A: I have never attended a seminar, no.

(Peikes Aff., Ex. B at 3.)   Thus, a dispute over genuine issues of material facts exist sufficient to preclude judgment as a matter of law on Defendant's Faragher-Ellerth defense.

## B.   Intentional Infliction of Emotional Distress

To establish a claim for intentional infliction of emotional distress under New Jersey law, a plaintiff must show (1) that the defendant intended to cause emotional distress, (2) that the conduct was extreme and outrageous, (3) that the actions proximately caused emotional distress, and (4) that plaintiff's emotional distress was severe.  Buckley v. Trenton Savings Fund Soc., 111 N.J. 355, 366 (1988).  Generally, for the conduct to be actionable, "the emotional distress must be so severe that no reasonable person could be expected to endure it."  Tarr v. Ciasulli, 181 N.J. 70, 77 (2004).  Because the Court finds that Plaintiff has not shown extreme and outrageous conduct on the part of Defendant, summary judgement as to this claim will be granted.

Establishing extreme and outrageous conduct requires a plaintiff to demonstrate conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Buckley, 11 N.J. at 366.  The contours of this tort are narrow, especially in the employment context.  See Fregara v. Jet Aviation Business Jets, 764 F. Supp. 940, 956 (D.N.J. 1991).  Indeed, courts have found that "it is extremely rare to find conduct in the employment context which will

rise to the level of outrageousness necessary to provide a basis for recovery." Id.; Griffin v. Tops Applicance City, Inc., 337 N.J. Super. 15, 23-24 (2001). "Because the severity of the emotional distress raises questions both of law and fact, the court decides whether as a matter of law such emotional distress can be found, and the jury decides whether it has in fact been proven." Tarr, 181 N.J. at 77 (citations omitted).

       This Court cannot conclude that the actions of Leonard and Ondic were so extreme and outrageous as to be utterly intolerable in a civilized community. The comments and actions of Leonard and Ondic may have been rude and inappropriate, but such conduct is insufficient to establish the extreme and outrageous element of an intentional infliction of emotional distress claim. See Marrero v. Camden County Bd. Of Social Services, 164 F. Supp. 2d 455, 480 (D.N.J. 2001)(evidence of "numerous occasions" when plaintiff was criticized for dressing inappropriately, and inappropriate comments along the lines of "your panties are showing," "I can see the print of your privates," and "are you wearing your daughters' clothes" did not support a cognizable claim for intentional infliction of emotional distress). Accordingly, Defendant's motion for summary judgment as to Plaintiff's claim for intentional infliction of emotional distress will be granted.

**C.**    **Negligent Retention**

       In Count Two of the Complaint, Plaintiff alleges that Defendant negligently retained Mr. Leonard and "[o]ther males at the Company who tormented Plaintiff . . . although they showed discriminatory bias and tormented Plaintiff along with Shawn Leonard." (Compl. ¶¶ 61-62.) Plaintiff also alleges that Human Resources provided no relief in this matter. (Id. ¶ 63.) To

establish a claim of negligent retention, a plaintiff must present evidence that: "(1) the employer knew or had reason to know of the employee's particular incompetence, unfitness or dangerous attributes, (2) the risk of harm to others created by these qualities could have been reasonably foreseen by the employer, and (3) the employee's dangerous characteristics or unfitness and the employer's negligence was the proximate cause of the injury." McAllister v. Greyhound Lines, Inc., 1997 WL 642994, at *4 (D.N.J. Oct. 7, 1997).

Prior to February 17, 2004, Plaintiff's last day in the Princeton office, Defendant had received no complaints about Leonard or Ondic that suggested either of them posed a threat or risk to female employees. (Murry Aff. ¶ 6.) Because the record is devoid of any evidence that Imagistics was aware of any alleged propensity for harassment on the part of Leonard or Ondic, Defendant's motion for summary judgment as to Plaintiff's claim for negligent retention will be granted.

### III.   CONCLUSION

For the foregoing reasons, the Court will **GRANT** in part and **DENY** in part Defendants' Motion for Summary Judgment.   An appropriate form of order will follow.

 s/ Stanley R. Chesler  
Stanley R. Chesler, U.S.D.J.